# UNITED STATES DISTRICT COURT

for the
District of Colorado

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the person by name and address)*<br><br>INFORMATION ASSOCIATED WITH FACEBOOK USER IDS 100026184494480, 610723829, 100001474806547, 100001004915579, 100001381703228, 100029368398250 and 1451624837 THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK INC. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Case No.   19-SW-5043-KLM |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that there is now concealed on the following person or property located in the ___Northern___ District of ___California and elsewhere___ *(identify the person or describe property to be searched and give its location)*:

**SEE "ATTACHMENT A"**, which is attached to and incorporated in this Application and Affidavit

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

**SEE "ATTACHMENT B"**, which is attached to and incorporated in this Application and Affidavit

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- X evidence of a crime;
- X contraband, fruits of crime, or other items illegally possessed;
- X property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of ___18___ U.S.C. §§ 371, 2019, 1030, 1341, 1343, 1349 2314, 1952, 1956(a), & 1956(h), and the application is based on these facts:

- X Continued on the attached affidavit, which is incorporated by reference.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*s/  Justin Stern*
_____
*Applicant's signature*

Justin Stern, FBI Special Agent
_____
*Printed Name and Title*

Sworn to before me and: ☐ signed in my presence.
☒ submitted, attested to, and acknowledged by reliable electronic means.

Date:  **15 Jan 2019**

_____
*Judge's signature*

City and state:  ___Denver, CO___

Hon. Kristen L. Mix, U.S. Magistrate Judge
_____
*Printed name and title*

# UNITED STATES DISTRICT COURT

for the
District of Colorado

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the person<br>by name and address)*<br><br>The e-mail account and information associated with<br>winsurf.technology@outlook.com that is in the<br>possession of Microsoft Corporation, whose office<br>is located at One Microsoft Way, Redmond, WA,<br>98052-6399, more fully described in Attachment A,<br>attached hereto. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Case No.   19-SW-5043-KLM |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that there is now concealed on the following person or property located in the ___State and___ District of ___Washington and elsewhere___ *(identify the person or describe property to be searched and give its location)*:

**SEE "ATTACHMENT C"**, which is attached to and incorporated in this Application and Affidavit

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

**SEE "ATTACHMENT D"**, which is attached to and incorporated in this Application and Affidavit

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

     X   evidence of a crime;

     X   contraband, fruits of crime, or other items illegally possessed;

     X   property designed for use, intended for use, or used in committing a crime;

     ☐   a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of ___18___ U.S.C. §§ 371, 2019, 1030, 1341, 1343, 1349 2314, 1952, 1956(a), & 1956(h), and the application is based on these facts:

     X   Continued on the attached affidavit, which is incorporated by reference.

     ☐   Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

 

                                *s/   Justin Stern*
                                             *Applicant's signature*

                              Justin Stern, FBI Special Agent
                                             *Printed name and title*

Sworn to before me and: ☐ signed in my presence.
                           ☒ submitted, attested to, and acknowledged by reliable electronic means.

Date:   **15 Jan 2019**
                                                     *Judge's signature*

City and state: ___Denver, CO___
                               Hon. Kristen L. Mix, U.S. Magistrate Judge
                                                 *Printed name and title*

# AFFIDAVIT

I, Justin Stern being duly sworn, hereby depose and state that the following is true to the best of my information, knowledge, and belief:

## INTRODUCTION AND AGENT BACKROUND

      1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been since 2004.  As the primary Case Agent, I am familiar with the facts of the case.  As a part of my training, I received seventeen weeks of investigative training at the FBI Academy in Quantico, Virginia.  Since completing training, I have participated in numerous criminal investigations.  These investigations have utilized physical and electronic surveillance, financial analysis, interviews, surreptitious recordings, undercover operations, search warrants, arrests, utilization of informants, seizure and analysis of computer information and various other techniques.  I am currently assigned to the Denver Division, responsible for investigating white collar crime and money laundering.  During my career with the FBI, I have investigated organized crime, drugs, gangs, violent crime, firearms and money laundering for approximately ten years  As part of my training and experience, I have participated in investigations involving electronic evidence, emails, text messages, and the Internet.

      2.      This affidavit is made pursuant to Title 18, United States Code, Section 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), in support of an application for a warrant to search the following Facebook accounts and all content found therein, which are also described in ATTACHMENT A ("hereinafter collectively referred to as "SUBJECT FACEBOOK ACCOUNTS), with items to be seized described in ATTACHMENT B:"

      a.      Facebook account number 100026184494480 associated with user "Sheldon.Holmquist.7 having a subscriber in the name of Sheldon Holmquist" (the "HOLMQUIST FACEBOOK ACCOUNT");

      b.      Facebook account identification 610723829, having a subscriber in the name of ZEESHAN ALAM (the "ALAM FACEBOOK ACCOUNT");

      c.      Facebook account number 100001474806547 associated with user "Safder.IQBAL3" (the "IQBAL FACEBOOK ACCOUNT");

      d.      Facebook account number 100001004915579 associated with user "Danish.RASHID.315 (the "RASHID FACEBOOK ACCOUNT");"

      e.      Facebook account number 100001381703228 associated with user "shelton.valentine," having a subscriber in the name of NAWEED Shelton Valentine (the "NAWEED FACEBOOK ACCOUNT");

      f.      Facebook account number 100029368398250, having a subscriber in the name of "Mark Thomas" (the "THOMAS FACEBOOK ACCOUNT").

g.      Facebook account number 1451624837 associated with user "rajesh.s.baghel (the "BAGHEL FACEBOOK ACCOUNT")."

3.      This affidavit is also made pursuant to Title 18, United States Code, Section 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), in support of an application for a warrant to search Microsoft Outlook email account winsurf.technology@outlook.com (hereinafter "SUBJECT EMAIL ACCOUNT") and all content found therein, which is described in Attachment C, with items to be seized described in Attachment D:

4.      For the reasons set forth below, I respectfully submit that there is probable cause to believe that located in the SUBJECT FACEBOOK ACCOUNTS and SUBJECT EMAIL ACCOUNT described in Attachments A  and C are items described in Attachment B and D, being evidence, fruits, and instrumentalities of federal crimes relating to fraud, money laundering and conspiracy, including access device fraud (18 U.S.C. § 1029), computer fraud (18 U.S.C. §  1030), mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), interstate transportation of stolen goods (18 U.S.C. § 2314), interstate travel in or transportation in aid of a racketeering enterprise (18 U.S.C. § 1952), money laundering (18 U.S.C. § 1956(a)), conspiracy to commit these crimes (18 U.S.C. §§ 371, 1030(b), 1349, 1956(h)), and aiding and abetting these crimes (the "SUBJECT CRIMES").

5.      Because this affidavit is being submitted for the limited purpose of securing search warrants, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause that evidence, fruits, and instrumentalities of violations of the SUBJECT CRIMES are present at the locations described.

6.      The information contained within the affidavit is based on my training and experience, as well as information imparted to me by other law enforcement officers involved in this investigation.

## THERE IS PROBABLE CAUSE TO BELIEVE THAT A CREW OF INDIAN NATIONALS ARE ENGAGED IN A SCHEME TO DEFRAUD VULNERABLE VICTIMS IN THE UNITED STATES

I.      **Background:  Common *Modus Operandi* of India-based Computer Refund Schemes**

7.      As set forth below, this investigation relates to a crew of Indian nationals engaged in organized, financial criminal activity.  The crew is primarily victimizing older Americans in a computer-based, fraudulent "refund" scheme.  Fraudsters dupe victims into believing victims will receive or have already received inadvertent refunds from computer service companies.  As a part of the scheme, fraudsters remotely access victims' personal computers via specialized software offered over the internet.  Thereafter, victims of false and fraudulent pretenses, promises, representations supply the fraudsters with, at times, tens of thousands of dollars in the form of cash, gift cards, money orders, money transfers and personal electronics.  Victims are initially led to believe such assets must be obtained and provided in the amount of the computer service companies' supposed refunds.  Victims are then caused to believe that additional assets

2

must be supplied in order to secure the return of assets previously provided in their defrauding. To date, victims have been identified in several states including Colorado

## II.  Subjects of Investigation and Their Relations to One Another

8.  **ZEESHAN ALAM**.  Based on the information set forth below, I have probable cause to believe that ALAM has used the alias "Sheldon Holmquist" to defraud and to attempt to defraud a victim, identified in this affidavit as V.H., out of several thousand dollars through the use of, among others, false and fraudulent pretenses, promises and representations related to refunds for computer services.  I have probable cause to believe that ZEESHAN ALAM uses the HOLMQUIST and ALAM FACEBOOK ACCOUNTS.

a.  The HOLMQUIST FACEBOOK ACCOUNT is a Facebook "friend" of the IQBAL FACEBOOK ACCOUNT.

b.  The HOLMQUIST FACEBOOK ACCOUNT is a Facebook "follower" of the RASHID FACEBOOK ACCOUNT.

c.  The HOLMQUIST FACEBOOK ACCOUNT is a Facebook "friend" of the BAGHEL FACEBOOK ACCOUNT.

9.  **SAFDER IQBAL**.  Based on the information set forth below, I have probable cause to believe that SAFDER IQBAL participated in a scheme to defraud victims, identified below as P.D. and D.O., out of several thousand dollars through false and fraudulent pretenses, promises and representations related to refunds for computer services.  I have probable cause to believe that IQBAL uses the IQBAL FACEBOOK ACCOUNT.

a.  The IQBAL FACEBOOK ACCOUNT is a Facebook "friend" of the HOLMQUIST FACEBOOK ACCOUNT, used by ZEESHAN ALAM.

b.  The IQBAL FACEBOOK ACCOUNT has communicated with the BAGHEL FACEBOOK ACCOUNT using Facebook's messenger services.

10.  **DANISH RASHID**.  Based on the information set forth below, I have probable cause to believe that DANISH RASHID participated in a scheme to defraud victim D.O. out of several thousand dollars through the use of false and fraudulent pretenses, promises and representations related to refunds for computer services.  I have probable cause to believe that RASHID uses the RASHID FACEBOOK ACCOUNT.

a.  The HOLMQUIST FACEBOOK ACCOUNT which I have probable cause to believe is a used by ZEESHAN ALAM, is a Facebook follower of the RASHID FACEBOOK ACCOUNT.

b. The RASHID FACEBOOK ACCOUNT has communicated with the NAWEED FACEBOOK ACCOUNT using Facebook's messenger service since at least 2011.

11.    **MOHAMMED NAWEED**.  Based on the information set forth below, I have probable cause to believe that NAWEED has used the alias "Mark Thomas" to defraud victim D.O. out of several thousand dollars through the use false and fraudulent pretenses, promises and representations related to refunds for computer services.  I have probable cause to believe NAWEED uses the NAWEED FACEBOOK ACCOUNT, created and used the THOMAS FACEBOOK ACCOUNT, and uses the SUBJECT EMAIL ACCOUNT.

a. The NAWEED FACEBOOK ACCOUNT has communicated the RASHID FACEBOOK ACCOUNT using Facebook's messenger service since 2011.

12.    **RAJESH SINGH BAGHEL**.  Based on the information set forth below, I have probable cause to believe that BAGHEL and SAFDER IQBAL have communicated about schemes to defraud elderly victims in the United States to obtain gift cards and money via the BAGHEL and IQBAL FACEBOOK ACCOUNTS.  I have probable cause to believe BAGHEL uses the BAGHEL FACEBOOK ACCOUNT.

a. The BAGHEL FACEBOOK ACCOUNT has communicated with the IQBAL FACEBOOK ACCOUNT using Facebook's messenger service.

### III.    <u>Initial Investigation into Suspicious Transnational Financial Transactions</u>

13.    On or about January 11, 2018, Thornton Police Department ("TPD") Detective Ty Deichert initiated an investigation of an individual who later became Confidential Human Source (CHS) 1, upon receiving information from an investigator employed by Walmart.  The investigator identified CHS-1 as a possible perpetrator of fraudulent activity.  Walmart investigators' review of transactional records and store surveillance camera footage associated CHS-1 with hundreds of thousands of dollars of other-branded gift card purchases via the redemption of Walmart gift cards of suspicious origins.

14.    On May 30, 2018, I initiated an FBI investigation.

15.    On July, 20, 2018, I interviewed CHS-1.  Beginning on or about September 2017, CHS-1 was employed by a group of Chinese nationals as a "purchasing agent" in the United States.  In this capacity, the group paid CHS-1 a commission to redeem large retailers' gift cards for other-branded gift cards in-person in the United States and then transmit the other-branded gift card numbers back to the group.  The group primarily provided CHS-1 with Walmart gift cards, which CHS-1 was directed to redeem in-person at Walmart stores.  The group informed CHS-1 that CHS-1's employment was legitimate and lawful.

16.    I submit that CHS-1 is reliable and credible.  I have corroborated CHS-1's information via my review of historical and pro-actively obtained WeChat text messages;

recorded internet-based telephone calls; and pro-active investigation, with the assistance of an FBI contract-linguist.  CHS-1 has a prior arrest for a prostitution-related crime.

17.     Investigators have traced the origins of dozens of Walmart gift cards believed to have been redeemed by CHS-1, before CHS-1 began cooperating with the investigation. Investigators have utilized records from Walmart and financial institutions to identify and interview the some of the cards' purchasers.  On July 28, 2018, FBI Forensic Accountant Shawn Taylor interviewed A.D., a sixty-six year-old resident of West Virginia.  On July 31, 2018, Taylor interviewed P.M., a seventy-one year old resident of Virginia.  On September 25, 2018, I interviewed D.B., a seventy-nine year-old resident of Colorado.  All of the interviewees: received solicitous telephone calls from fraudsters who spoke accented English; purchased and provided gift cards as part of a computer-based refund scheme; had their computers remotely-accessed by the fraudsters; and identified the circumstances of their provision of gift cards as the result of fraudulent schemes.  The interviewees suffered losses of approximately $4,000 - $28,000.

18.     On July 19, 2018, I directed CHS-1 to participate in a pro-active investigation in Westminster, Colorado, whereby I directed CHS-1 to obtain Walmart gift card numbers from CHS-1's employers.  Immediately after CHS-1 received the gift card numbers, investigators supplied the information to Walmart security personnel for appropriate action.  Investigators then conducted follow-up investigation with Walmart and financial institutions to trace the origins of the gift card numbers, identify the purchasers, and determine the circumstances of the purchasers' acquisition and provision of the gift card numbers.

### IV.     Identification of ZEESHAN ALAM, a/k/a "Sheldon Holmquist" as a Participant in the Scheme and his use of the HOLMQUIST and ALAM FACEBOOK ACCOUNTS

19.     Investigators identified V.H., as one of the purchasers of Walmart gift cards, some of whose numbers CHS-1's employers provided CHS-1 for redemption during the pro-active investigation on July 19, 2018.

20.     On July 24, 2018, I interviewed V.H. via telephone.  V.H. is a sixty-six year-old resident of Washington state.  Among other things, V.H. confirmed that on July 19, 2018, V.H. had purchased six Walmart gift cards in the total amount of $3,000.  V. H. provided the gift card numbers to an individual using the name "Sheldon Holmquist," as part of a computer-based refund scheme.  In the course of V.H.'s defrauding, Holmquist accessed V.H.'s computer via a TeamViewer remote access program.

21.     Holmquist also defrauded V.H. by convincing V.H. that V.H. was partially responsible for a bombing in India that resulted in children's deaths.  Holmquist had learned that V.H. was involved in an online, romantic relationship with an individual known as Michael Patterson, whom V.H. had never met in person.  V.H. purchased and sent Patterson two Apple laptops and an iPad to South Africa.  Holmquist told V.H. that Patterson supposedly used the Apple electronics to build bombs that killed Indian children.  Holmquist wanted V.H. to pay $100,000 to the families of the slain children as compensation and goodwill for V.H.'s supposed

role in the children's deaths.  V.H. reduced the amount of V.H.'s compensatory payment to $30,000 by negotiating with Holmquist.  At the time of my interview with V.H., on July 24, 2018, at Holmquist's direction, V.H. had withdrawn $30,000 cash and had purchased a plane ticket for travel to Bangkok, Thailand on July 25, 2018.  At the airport in Bangkok, V.H. intended to meet with and provide Holmquist with the $30,000 cash.

22.     V.H. told me V.H.'s total losses from fraudulent schemes, including losses caused by Holmquist, were in excess of $100,000.  I note that investigators have not yet determined if multiple, independently operating entities are responsible for the total amount of V.H.'s defrauding or if the entirety is connected to Holmquist.  I also note V.H. has provided investigators with various receipts and records of V.H.'s, which have not yet been tabulated.

23.     Consistent with my advice, V.H. decided not to travel to Bangkok and did not meet and provide Holmquist with $30,000.  Thereafter, Holmquist arranged for an affiliate to travel to V.H.'s hometown in Washington and retrieve the $30,000 cash from V.H. in-person.  At my direction, V.H. agreed to cooperate with FBI Agents and Task Force Officers in a controlled money-pick-up operation in V.H.'s hometown.

24.     On July 25, 2018, with V.H.'s consent, Agents Eric Barker and Christian Parker recorded a WhatsApp call that occurred between V.H. and Holmquist.  According to Agent Barker, during the call Holmquist directed V.H. to travel to a nearby Kmart store and meet with and provide the $30,000 cash to Holmquist's affiliate.  Holmquist told V.H. that Holmquist's affiliate would be driving a white Toyota Camry and would provide V.H. with a $1 bill.  Holmquist said the $1 was uniquely identified by its serial number and would serve as verification the bearer was Holmquist's affiliate.

25.     Immediately thereafter, on July 25, 2018, V.H. drove to the Kmart parking lot.  There, FBI Task Force Officers identified a white Toyota Camry in the parking lot.  Upon V.H.'s arrival, an individual, later identified as Jagdeep Gill, met with and provided V.H. with the $1 bill bearing the serial number identified by Holmquist.  Agents and Task Force Officers detained Gill.  Later, on September 12, 2018, V.H. provided Agent Barker with the $1 bill Gill provided to V.H.

26.     On August 20, 2018, FBI Computer Scientist Brian Turner conducted open-source research on a Facebook account associated with Sheldon Holmquist, which was not restricted from the public.  Although the accountholder's profile photograph does not match that of V.H's screenshots of Holmquist taken during their video-chats, I submit the account is used by the same Sheldon Holmquist that defrauded V.H.  My belief is founded, in part, by Turner's recovery of a photograph and associated comment by the accountholder on August 9, 2018.  A photograph of a $1 bill was posted having the serial number covered with a white stripe.  The photograph is posted with the caption [verbatim]:  "At last.  It's time to spend the cash!!!"  My comparison of the $1 bill's unique markings and blemishes with the $1 bill V.H. obtained from Gill, leads me to believe the bills are the same.  I submit Holmquist's Facebook post is a reference to Holmquist's intent to spend funds Holmquist fraudulently obtained from V.H.

27.     Computer Scientist Turner also located a post Holmquist made on Facebook on May 20, 2018 on a page titled "Tech Support Sales Lead Provider."  A portion of the post, which I believe references computer-based, tech-support refund schemes like the one that targeted V.H., states [verbatim]:

> "We are looking for people who can transfer their customer consoles and leads to us for getting bigger Sales & Refund amount.  You can transfer your customer consoles and calls to us if you want to make higher money from every sales & refunds.  All you need to do is open up the computer of the customer with their online banking.  Once you confirm the customer has good money in their bank account you simply transfer the calls to us and we will make sure that your customer must pay a higher sales & refund amounts amount.  We are open to work with you on shared commission basis and on every sales & refunds we will be doing on your transferred calls.  We will do every sales & refunds with complete transparency.  You can keep the access of the computer of the customer to see what are doing with your customer and what we are charging them.  You can even send or appoint one of your team member in our location to monitor our sales & Refund activity so that you have peace of mind and can work with us trustfully…"

28.     Computer Scientist Turner also located a post on August 7, 2018, Holmquist placed on multiple Facebook pages included those known as: "Tech Support Kolkata," "Tech Support Delhi + Kolkata," "CCP-Call Center Process."  Holmquist states [verbatim]: "I have a team of 10 experienced refund agents.  I need data providers or console providers who want to work on a percentage basis. Face to face deal preferred.  Delhi.  'Time passers stay away[.]'  No advance payments of any sort."  I interpret Holmquist's post as an advertisement for criminal job-seekers, meaning, among other things: Holmquist employs a crew of ten individuals to conduct refund schemes.  Holmquist is seeking additional employees to engage in and perpetuate refund schemes on a commission basis.  Applicants should meet Holmquist in person in New Delhi, India.  Potential applicants with a poor work ethic need not apply.  Holmquist will not provide commissions in advance.

29.     One of the ways V.H. communicated with Holmquist was via WhatsApp, a messaging and voice-over-internet-protocol platform.  On August 1, 2018, V.H. informed me that Holmquist's WhatsApp number may be 91900786300.  V.H. has provided the FBI with V.H.'s personal computer that was remotely accessed by Holmquist.  FBI Computer Scientist Brian Turner has forensically examined V.H.'s computer.  Among other findings, Computer Scientist Turner located a Google search query for the number 19007863000, which is only one digit off from the number provided by V.H. (the one found by Turner has one additional "0" at the end).  On July 25, 2018, V.H. provided me with two cellular telephone screenshots V.H. took of Holmquist during video-calls.

30.     On August 16, 2018, I received records from WhatsApp concerning telephone number 919007863000.  The records showed that the multifactor identification e-mail associated with the number was djzeeshu@gmail.com.

31.     On October 1, 2018, I received records from Facebook Inc. concerning the ALAM FACEBOOK ACCOUNT, having a subscriber in the name of ZEESHAN ALAM, account e-mail address djzeeshu@gmail.com.  One of the account's telephone numbers was 19007863000, which was verified on November 14, 2013.

32.     Also on October 1, 2018, Computer Scientist Turner conducted open source research on the term "djzeeshu."  Among other things, Turner located a page for an individual known as Nausheen Alam on a website known as Imgrum, which I understand to be a viewer for Instagram, a social media website.  The post was made on October 5, 2017 at 6:40 a.m.  The post contains a photograph of four individuals.  I submit one of these individual is the same individual, Sheldon Holmquist, as seen in V.H.'s screenshots taken during their video-chat calls. A portion of the post accompanying the photograph states [verbatim]: "My babies @aruna_zeesham_alam and @djzeeshu…"

33.     Based on the evidence set forth above, I also submit that there is cause to believe ZEESHAN ALAM is using the alias Sheldon Holmquist to commit financial crimes.

## V.     Identification of SAFDER IQBAL, DANISH RASHID and RAJESH SINGH BAGHEL as Scheme Participants and their Respective use of the IQBAL, RASHID and BAGHEL FACEBOOK ACCOUNTS

34.     On September 26, 2018, Computer Scientist Turner conducted open source research on "Sheldon Holmquist."  Among other things, Turner reviewed and captured a screenshot of Holmquist's Facebook friends.  SAFDER IQBAL, with a location of Colorado Springs, Colorado, was present as one of Holmquist's Facebook friends.  Baghel, with a location of Kolkata, was also present as one of Holmquist's Facebook friends.

35.      On January 7, 2019, I obtained Colorado state identification information for IQBAL and RASHID via the National Crime Information Center database.  IQBAL's Colorado state identification number is 170992142 and was issued on July 30, 2018.  IQBAL's address is listed as 2021 Southgate Road Apartment 42, Colorado Springs, Colorado 80906.  IQBAL's date of birth is noted as March 4, 1991.  RASHID's Colorado state identification number is 171011453 and was issued on July 20, 2018.  RASHID's listed address is the same as IQBAL's address is listed as 2021 Southgate Road Apartment 42, Colorado Springs, Colorado 80906-2642.  RASHID's date of birth is noted as February 27, 1990.

36.     On October 11, 2018, Homeland Security Investigations Special Agent Trevor Helderop drafted a report summarizing IQBAL's and RASHID's immigration information based on identifying information I provided to Agent Helderop.  Among other information, the report notes IQBAL is a citizen of India.  IQBAL holds an Indian passport and arrived in the United States on April 25, 2018, via Qatar Airlines flight 739.  IQBAL was issued a J1 visa, whose application reflects IQBAL would be participating in an internship at the Broadmoor Hotel in Colorado Springs.  The report states RASHID is a citizen of India.  RASHID holds an Indian passport and also arrived in the United States on the same flight as IQBAL.  RASHID, just like

IQBAL, was issued a J1 visa as part of his participation in an internship at the Broadmoor Hotel. Both IQBAL's and RASHID's visas will expire on March 25, 2019.

### A.    IQBAL's Efforts to Defraud Victim P.D.

37.    P.D. is seventy-four years old and resides in West Branch, Michigan.  On October 3, 2018, I interviewed P.D.  From June 13, 2018 to June 21, 2018, P.D. was the victim of a computer-based refund scheme.  P.D. primarily communicated with an individual known as Martin King.  On June 13, 2018, P.D. received a telephone call from King.  King told P.D. that P.D. had purchased computer security service for $499 and that the service company had inadvertently provided P.D. with a refund in the amount of $4,999.

38.    At the approximate time of King's call, P.D. was also attempting to access P.D.'s bank account information with the Northland Area Federal Credit Union (hereinafter NAFCU).  P.D.'s entry of P.D.'s password resulted in P.D. being locked out of the NAFCU account.  King remotely accessed P.D.'s computer and P.D. watched as King erased P.D.'s NAFCU password.  King then successfully entered another password and accessed P.D.'s NAFCU account.  King showed P.D. the supposed, inadvertent refund of $4,999 into P.D.'s NAFCU account.  On P.D.'s computer screen, P.D. saw what appeared to be a transfer of $4,999 from P.D.'s savings account into P.D.'s checking account at NAFCU.  Later, when P.D. independently checked P.D.'s NAFCU accounts, P.D. learned that the refund in the amount of $4,999 into P.D.'s account had never actually occurred.

39.    Thereafter, King directed P.D. to provide King and King's associates with approximately $20,000 in money orders, branded gift cards and cash.  [Of this amount, Western Union and 1st Bank returned approximately $5,000 combined to P.D.]

40.    As a part of the scheme, P.D. sent approximately $6,000 -$7,000 in cash to IQBAL via United States mail at the following address: Copper Chase Apartments, 2021 Apartment 42, Colorado Springs, Colorado 80906.  P.D. also sent IQBAL $2,000 in Western Union money orders.  P.D. was required to mail cash to IQBAL because P.D. was informed that gift cards P.D. purchased in the amount of $7,000, and provided as part of the scheme, were not valid.  P.D. retained records of P.D.'s relating to P.D.'s victimization in the fraudulent scheme.

41.    P.D.'s husband suffers from Alzheimer's disease.

42.    On October 5, 2018, I interviewed Jaclyn Ryden.  Ryden is employed by 1st Bank as an Assistant Manager of a branch located at 405 East Cheyenne Mountain Boulevard (hereinafter ECMB), Colorado Springs, Colorado 80906.  Ryden was present when IQBAL opened an account at the branch located at 405 ECMB.  Ryden approved the account's opening.  RASHID accompanied IQBAL to the branch when IQBAL opened the account.  IQBAL said that IQBAL and RASHID were brothers.

43.    According to Ryden, on June 18, 2018, IQBAL came into the branch at 405 ECMB wanting to cash two United States Postal money orders, each in the amount of $1,000, for a total of $2,000.  After IQBAL cashed the money orders in the amount of $2,000, IQBAL requested to cash another three United States Postal money orders, each in the amount of $1,000,

for a total of $3,000. Ryden refused to cash the additional money orders because IQBAL did not have sufficient funds on deposit to do so.

44.     Also according to Ryden, IQBAL returned to the branch on June 20, 2018 with the three thousand dollars in money orders. Ryden became suspicious and questioned IQBAL about the nature of the money orders. IQBAL identified the remitter, P.D., as IQBAL's friend who was helping IQBAL purchase a Ford Mustang automobile. Ryden then deposited the money orders into IQBAL's account and placed an "exceptional hold" on the account, meaning only five dollars was available for withdrawal. Ryden contacted 1st Bank's Fraud Department and informed the department of the circumstances involving IQBAL and P.D.'s money orders.

45.     Also according to Ryden, between June 20, 2018 and July 1, 2018, IQBAL returned to the branch at 405 ECMB and again sought to withdraw the $3,000 derived from P.D.'s money orders from IQBAL's accounts. Ryden refused and informed IQBAL that IQBAL's accounts had been closed. Approximately one month after June 20, 2018, IQBAL returned to the branch and signed a withdrawal slip allowing 1st Bank to return the $3,000 to P.D. When Ryden told IQBAL that IQBAL had fraudulently obtained the funds from P.D., IQBAL responded: "No, no. I'll just call her. She's confused and her husband is just getting into her head."

46.     On October 5, 2018, I interviewed Cathy Ryan (hereinafter Cathy). Cathy is employed by 1st Bank as an Associate Analyst in Fraud Investigations. On June 20, 2018, Cathy twice spoke to IQBAL on the telephone, number 719-330-5762. During Cathy's first call with IQBAL at approximately 12:30 p.m., Cathy asked IQBAL to identify P.D.'s age. IQBAL did not answer the question and responded by saying IQBAL was very tired and had just finished working. IQBAL requested Cathy call back at 2:00 p.m.

47.     Cathy called IQBAL back at approximately 2:00 p.m. the same day and continued questioning IQBAL about the nature of the money orders IQBAL received from P.D. IQBAL incorrectly identified P.D.'s age as sixty-four. IQBAL said that IQBAL and P.D. were friends. IQBAL claimed that IQBAL had helped out P.D. in the past. In return, P.D. was helping IQBAL with IQBAL's move to Colorado by purchasing a 2005 Ford Mustang automobile and paying IQBAL's rent until IQBAL found a job and got settled.

48.     A couple of days after June 20, 2018, Cathy also spoke to P.D. via a telephone call. P.D. told Cathy that P.D. did not know IQBAL.

49.     On October 16, 2018, I received records and information concerning P.D. and IQBAL from United States Postal Inspector Sonia Hacker. Among the Postal Service records and information were scans of the following items: a United States Postal Service priority express mailing label; a sales receipt for an envelope having tracking number 9505510743778166236032; a tracking report for the envelope having tracking number x6032; and a sales receipt for five $1,000 money orders, totaling $5,000.

50.     The priority express mailing label was handwritten. It identified P.D. as the sender. It bore P.D.'s home address in Michigan as the sender. The label identified IQBAL as

the recipient, with an address of 2021 Southgate Road Apartment 42, Colorado Springs, Colorado 80906. The label bore the date and time of acceptance: June 19, 2018, 3:22 p.m. The label has a handwritten note on the upper left-hand side stating the following [verbatim]: "This lady sent $6,000 to this person. I asked her if she wanted to put the cash into a money order[.]" The note was signed by Samantha Nelson.

51.     On October 23, 2018, Inspector Hacker and I interviewed Nelson. For approximately the past eighteen months, Nelson has been employed as a part-time flex clerk at the United States Post Office in West Branch, Michigan. On June 19, 2018, Nelson provided service to P.D. while working at the Post Office's counter. Nelson saw P.D. place $6,000 cash into an envelope and mail the item to IQBAL in Colorado. The $6,000 consisted of $100 bills. Nelson assisted P.D. complete the express mailing label. P.D. told Nelson that P.D. was having issues with P.D.'s computer due to a virus and that "they" directed P.D. to send cash because "they" did not want money orders. P.D. told Nelson that P.D. was unable to open P.D.'s computer because of the virus. Nelson was concerned that P.D. was sending the $6,000 to IQBAL under fraudulent pretenses and advised IQBAL not to do so. P.D. sent the $6,000 cash despite Nelson's warning. Nelson drafted and placed a note on the mailing label as a reminder for Nelson to speak to postmaster about the matter.

52.     The receipt for the money orders showed that five money orders in the amount of $1,000 each were purchased at the West Branch Post Office on June 15, 2018 at 4:51 p.m. The sales receipt for the envelope having tracking number x6032 shows that the mailing was paid for on June 15, 2018, at 5:03 p.m. The tracking report for the envelope having tracking number x6032 shows the item was sent from West Branch, Michigan to an apartment building located at 2021 Southgate Road, Colorado Spring[s], Colorado 80906. The envelope was delivered to the address on June 18, 2018, at 10:41 a.m. I submit that there is cause to believe the envelope having tracking number x6032 contained the same five Postal money orders IQBAL negotiated and attempted to negotiate at 1st Bank on June 19, 2018 and thereafter.

53.     On October 18, 2018, FBI Agents Doug Smith and Anthony Kraudelt met with P.D. and obtained items from P.D. These items included receipts P.D. maintained of gift cards P.D. purchased and provided as part of P.D.'s victimization. FBI Forensic Accountant Erin Newton has tabulated the gift card receipts. Forensic Accountant Newton's calculations show that P.D. purchased gift cards in the total amount of $7,251.99 on June 15, 18, and 20, 2018.

## B.     IQBAL's and RASHID's Efforts to Defraud Victim D.O.

54.     D.O. is sixty-eight years old and resides in Milwaukee, Wisconsin. On October 11, 2018, I interviewed D.O. According to D.O., since on or about June or July 2017 to the time of D.O.'s interview, D.O. has been the victim of a computer-based refund scheme. D.O. has primarily communicated with an individual known as Mark Thomas, who first called D.O. in June or July 2017. Thomas claimed to represent a company known as Winsurf Technology. Prior to receiving the call, D.O. had paid Winsurf Technology approximately $400 to remotely clean-up and take care of viruses present on D.O.'s personal computer. Thomas told D.O. that Winsurf Technology was terminating as a company. As a result, Thomas told D.O. that Winsurf Technology had inadvertently sent a $1,000 payment to D.O.

55.     Thomas remotely accessed D.O.'s computer via a TeamViewer program.

56.     Thomas then directed D.O. to purchase and provide D.O and others with branded gift cards, MoneyGram and Western Union money orders, and other transfers.  D.O. estimated D.O. has lost approximately $50,000 as result of the scheme.  In addition, D.O. has also incurred approximately $10,000 in bank overdraft fees as a result of D.O.'s victimization.  According to D.O., the financial losses D.O. has sustained have ruined D.O.'s life.

57.     Thomas provided D.O. with IQBAL's and RASHID's names.  As a part of the scheme, Thomas directed D.O. to provide IQBAL and RASHID with Western Union money orders in the amount of $1,000 each.  D.O. sent the money orders to IQBAL and RASHID in Colorado Springs, Colorado on August 4, 2018.  D.O. said D.O. had no legitimate reason to send IQBAL and RASHID the two, $1,000 Western Union money orders.

58.     On December 3, 2018, Forensic Accountant Newton received records from Western Union regarding D.O., IQBAL and RASHID.  The records show that on August 4, 2018, at 2:27 p.m. (ET), D.O. sent RASHID $1,000 from a Walgreens located at 6600 West State Street, Wauwatosa, Wisconsin.  RASHID received the $1,000 on August 4, 2018 at 5:08 p.m. (ET) at a Safeway grocery store, located at 1920 South Nevada Avenue, Colorado Springs, Colorado.  RASHID's telephone number is identified as 719-331-4530.  RASHID's address is identified as 2021 Southgate, Colorado Springs, Colorado 80906.  RASHID's date of birth matches the known date of birth listed on his Colorado state identification.  RASHID utilized identification from India to receive the money.

59.     The records also show that on August 4, 2018, at 2:29 p.m. (ET) D.O. sent $1,000 from the same Walgreens in Wauwatosa, Wisconsin to IQBAL.  IQBAL received the $1,000 on August 4, 2018 at 7:50 p.m. (ET) at the same Safeway grocery store in Colorado Springs.  IQBAL's telephone number is identified as 719-330-5762.  IQBAL's address is identified as 2041 Southgate Road, Colorado Springs, Colorado.  IQBAL's date of birth marches the known date of birth listed on his Colorado state identification.  IQBAL utilized identification from India to receive the money.

60.     On October 5, 2018, I obtained surveillance videos from the Safeway store located at 1920 South Nevada Avenue.  The video consists of footage related to RASHID's and IQBAL's receipt of the Western Union money orders.  Sean Johnson was present during my retrieval of the surveillance video.  Johnson is employed as the Store Director at the Safeway located at 1920 South Nevada Ave.  Johnson provided me with the name and contact information of Sean Clark, the Safeway employee who provided Western Union services to RASHID and IQBAL on August 4, 2018.

61.     On November 2, 2018, I interviewed Clark.  On August 4, 2018, Clark was employed by Safeway as a Booth Clerk at the store at 1920 South Nevada Avenue.  Clark's shift was from 11:30 a.m. to 8:00 p.m.  Clark's responsibilities included working behind the customer service counter processing Western Union money transfers.  I showed Clark both RASHID's and IQBAL's Colorado state identification photographs without identifying information.  Although

Clark did not identify RASHID and IQBAL by name, Clark identified both as the individuals who Clark provided $1,000 each from D.O. in Wisconsin via Western Union.

62.     Of RASHID and IQBAL, Clark recalled that the first recipient told Clark that D.O. was the recipient's uncle and that D.O was helping the recipient pay rent with the $1,000. Later the same day, when the second recipient obtained $1,000 from Clark, the second recipient said that the first and second recipients were brothers.  The second recipient also said D.O. was the second recipient's uncle and was helping the second recipient pay rent with the funds.

63.     I submit that RASHID was the first recipient and IQBAL the second.

64.     Clark always utilized the same protocol when Clark provided service to customers picking up funds via Western Union.  Clark would query the customers' telephone numbers in the computer.  Clark would check customers' photo identification.  Clark always visually confirmed the customer was the same as the individual depicted in the photo identification. Clark would input the customers' identification into the computer.  The computer would then retrieve customers' transactional information.  Every time, Clark would then ask customers to provide the name of the sender/remitter as well as the amount; Clark did so in order to determine if the circumstances were suspicious.  If customers' answers matched the information in the computer, Clark would type-in customers' identification, address and other, required personal information.  Thereafter, Clark would print a receipt, obtain customers' signatures and provide the cash.

65.     On October 25, 2018, about and between approximately 11:44 a.m. and 12:14 p.m. (MT), I placed an outgoing telephone call to RASHID at telephone number 719-331-4530. I recorded the call.  I conducted the call in an undercover capacity, posing as a Western Union employee inquiring about the circumstances of RASHID's receipt of $1,000 from D.O. on August 4, 2018.

66.     During the call, RASHID confirmed his identity.  RASHID said he came to the United States for an internship.  RASHID told me he never received a Western Union payment in the amount of $1,000 from D.O. at the Safeway located at 1920 South Nevada Avenue at approximately 3:09 p.m.  RASHID said his name has been fraudulently associated with the payment.  RASHID said he does not know an individual named D.O.  RASHID told me he did not know anything about D.O.'s Western Union payment to him.  RASHID said he has been the victim of multiple fraudulent schemes since arriving in the United States.  RASHID confirmed his date of birth, which matches the date of birth on his state identification and the date of birth listed on the Western Union records described above. RASHID confirmed that his former address was 2021 Southgate Road Apartment 42, Colorado Springs.  RASHID said he was in Denver, Colorado and that he was not from India.  Rather, RASHID said he was from Dubai. RASHID told me he was going to leave the United States on November 11, 2018.

**C.     D.O.'s Recorded Calls and Interactions with NAWEED Shelton Valentine, also known as MOHAMMED NAWEED, also known as Mark Thomas, also known as a Representative of Winsurf Technology**

67.     D. O. has cooperated with my investigation in a pro-active manner.  At my direction, D.O. has recorded multiple telephone calls with Thomas.

68.     On October 12, 2018, approximately 12:46 p.m. – 12:56p.m. (MT), D.O. placed an outgoing, recorded telephone call to Thomas.  D.O. reached Thomas at telephone number 859-305-1866.  Among other things, Thomas told D.O. that [October 12, 2018] was the last opportunity for D.O. to have D.O.'s money returned to D.O.  In order for D.O. to receive D.O.'s money, D.O. would have to purchase and provide $3,000 in gift cards to Thomas.  The amount of funds Thomas would return to D.O. in exchange for the gift cards was $100,000, minus $11,000.

69.     On October 12, 2018, approximately 2:21 p.m. – 2:27 p.m. (MT), D.O. placed an outgoing, recorded call to Thomas.  D.O. reached Thomas at telephone number 859-305-1866.  Among other things, Thomas said D.O. has had problems with Western Union in the past.  Thomas directed D.O. to purchase Apple gift cards.  Thomas told D.O. the rules Thomas was following were Winsurf [Technology's] rules.

70.     On October 18, 2018, FBI Computer Scientist Turner and I met with D.O. in Milwaukee, Wisconsin.  Among other things, D.O. provided me with various gift cards, receipts and documents relating to D.O.'s victimization by Thomas.  I also directed D.O. to utilize a laptop computer the FBI purchased for D.O.'s operational use.  Thereafter, I directed D.O. to conduct multiple, recorded telephone and Skype video calls with Thomas.  In the course of the operation, Thomas remotely-accessed the FBI laptop via TeamViewer software.  Computer Scientists Turner and I recorded Thomas' remote-access [TeamViewer] session via Bandicam, computer-screen recording software.  I have reviewed the Bandicam recording of Thomas' session that began at approximately 4:01 p.m. (CT).  At approximately 4:02 p.m., Thomas began accessing the laptop via TeamViewer.

71.     Simultaneously, as Thomas accessed the laptop via TeamViewer, D.O. conducted an outgoing, recorded telephone call with Thomas at telephone number 859-305-1866.  The call was initiated at approximately 3:59 p.m. (CT).

72.     Also at my direction, D.O., on October 18, 2018, D.O. conducted three Skype video-chat calls with Thomas utilizing the FBI-purchased laptop.  The three Skype calls were initiated at the following approximate times (CT): 4:40 p.m., 5:09 p.m. and 5:44 p.m.  During the Skype calls, I recorded the computer screen via Bandicam [which captured only Thomas' audio portion of the conversations].  The Bandicam recordings contain footage of Thomas' face.  I also made separate audio recordings of each call, which contain both participants' portion of the conversations.

73.     Also during the pro-active operation on October 18, 2018, I directed D.O. to request Thomas create and share with D.O. a Facebook social-media account.  D.O. recorded an outgoing telephone call with Thomas at telephone number 859-305-1866.  The call occurred

from approximately 6:56 p.m. – 7:04 p.m. (CT).  During the call, Thomas created and provided D.O. with a Facebook account for Thomas, account number 100029368398250.

74.     On October 24, 2018, pursuant to a federal court order, I received records from Facebook for the THOMAS FACEBOOK ACCOUNT that included information for accounts associated with it via computer cookies.  Among other information, the records showed that the NAWEED FACEBOOK ACCOUNT was associated with the THOMAS FACEBOOK ACCOUNT via computer cookie "_OAYWGvzwGAAHgMeX5LjNTDC."  Additionally, computer cookie "WQhiW_8LNje0gs7-aQXk3lIo" also associated the THOMAS and NAWEED FACEBOOK ACCOUNTS.

75.     On October 29, 2018, FBI Agent Erin Lucker obtained items of evidence from the Milwaukee Police Department (hereinafter MPD).  D.O. had previously provided the items to MPD.  Among other things, the evidence included gift cards, receipts and other records of payments or things of monetary value D.O. provided to those that defrauded D.O.  Forensic Accountant Newton has tabulated these items as well as the items D.O. provided to me on October 18, 2018.  Newton's tabulation showed that between on or about May 12, 2017 to on or about September 2, 2018, D.O.'s losses as a result of the fraudulent scheme approximated $62,403.

### D.     *Facebook Communications between DANISH RASHID and MOHAMMED NAWEED, also known as Mark Thomas*

76.     On November 8, 2018, pursuant to a federal arrest warrant authorized in the District of Colorado, Detective Deichert and I arrested RASHID in Colorado Springs, Colorado.  Detective Deichert and I interviewed RASHID.  RASHID consented to my search of RASHID's cellular telephone, to include my review and photographing of some of the content made available via the RASHID FACEBOOK ACCOUNT, which RASHID was able to access.  One of the accounts I reviewed while accessing RASHID's cellular telephone was the NAWEED FACEBOOK ACCOUNT.

77.     One of the photographs I took showed a Facebook text message exchange between RASHID and NAWEED that was dated September 27, 2011.

78.     At my direction, RASHID placed two audio-recorded Facebook calls to NAWEED.  The calls took place between the RASHID and NAWEED FACEBOOK ACCOUNTS.  Among other things, I tasked RASHID to engage NAWEED in conversation concerning the victimization of D.O.  The first call occurred from approximately 1:13 p.m. to 1:17 p.m.  The call was an audio-only, outgoing call from RASHID to NAWEED.  The second call was a Facebook video-chat call that occurred from approximately 1:19 p.m. to 1:22 p.m.  The call was incoming, from NAWEED to RASHID.  During both calls, NAWEED and RASHID spoke Hindi.

79.     I have compared the cellular telephone screen-shots DANISH RASHID took of MOHAMMED NAWEED during the pair's Facebook video-chat on November 8, 2018 with the video recordings of Thomas' face captured during D.O.'s Skype calls with Thomas on October 18, 2018, which are described above in paragraph 72.  My comparison of the images causes me

to believe that the same individual is present in both: I submit NAWEED and Thomas are the same individual.

80.     On December 8, 2018, a Hindi linguist completed a draft of a transcript of the two Facebook calls between NAWEED and RASHID.  The following is a portion of the draft translation of the first call.  I note that I have intentionally omitted the provision of D.O.'s name as written in the draft transcript.  Additionally, the transcript does not correctly note D.O.'s last name.  Rather, the transcript notes a last name sounding similar to D.O.'s.  The transcript reads [verbatim except for mention of D.O.]:

RASHID:     Okay, then... brother how much money have you taken from [D.O.].

NAWEED:     Have taken a good amount from him. . .

RASHID:     How much?

NAWEED:     In six months about sixty to seventy thousand approximately.

81.     I submit that during the call NAWEED admits to defrauding D.O. of a substantial amount of money, approximately $60,000 to $70,000.

82.     I directed RASHID to take screen-shots of NAWEED during the Facebook video-chat call that occurred on November 8, 2018 from approximately 1:19 p.m. to 1:22 p.m.; RASHID did so.

**E.     Use of the SUBJECT EMAIL ACCOUNT by MOHAMMED NAWEED, also known as Mark Thomas, also known as a Representative of Winsurf Technology, to Defraud D.O.**

83.     On December 15, 2018, I received email messages from D.O.  The email messages were forwarded exchanges between D.O. and Mark Thomas.

84.     One of the messages was received by D.O. from the SUBJECT EMAIL ACCOUNT, winsurf.technology@outlook.com, on October 24, 2018, at approximately 8:36 p.m. [time zone not noted] and has the subject line "Case closed."  The email states [verbatim]:

"You can continue to play your silly hide and seek games but its of no good as no matter what you do but you will not get a single dime you chose to shit over every opportunity that we gave now you can keep trying to contact us and make as many excuses as you want but the truth is that $100,000 USD is with us and we are going to make sure that you don't get even a single dime you forced us to do this as you constantly avoid our calls and violated every deadlines with careless attitude. We severed you with various opportunities where you could have saved yourself if you got the cards but you chose to play fool instead therefore you can continue to play fool and forget the money forever as we are not gonna contact you anymore and there is not a single thing you can do about it."

85.     I submit that among other things, the message shows Thomas' frustration with D.O.'s refusal to provide Thomas with additional gift cards.  Thomas admits to taking $100,000 from D.O.  As a consequence, Thomas informs D.O. that Thomas will not return any of D.O.'s funds.  Thomas also threatens to cease communicating with D.O.

86.     One of the messages was received by D.O. from the SUBJECT EMAIL ACCOUNT, on November 8, 2018, at 7:50:53 p.m. CT and has the subject line "Re: Attn: Mark Thomas."  The email states [verbatim]:

> "You get the cards and have your money and just to let you know all those guys whom you made the transfers don't work for nor did the guy whom you saw on video call works with me anymore so you can never find me if you want your money then stop wasting your time in finding me and get the cards as those people  were just setups and nobody knows where I'm right now you can never find me but if you get the cards then I promise to return all your money as promised earlier."

87.     I submit Thomas' email alleges that an individual other than Thomas interacted with D.O. during the Skype video calls on October 18, 2018.  I submit there is cause to believe that this statement is self-serving and is Thomas' attempt to make D.O. believe Thomas that Thomas wasn't the individual participating in the calls.  Among other things, Thomas also boasts that D.O. will never be able to locate Thomas.  Thomas offers to return D.O.'s fraudulently-obtained funds if D.O. obtains and provides Thomas with additional gift cards.

88.     Without my direction, D.O. sent Thomas an email message to Thomas at the SUBJECT EMAIL ACCOUNT on November 15, 2018, 5:47:50 a.m. [time zone not noted].  The message's subject line was titled "Attn: Mark Thomas."  D.O. wrote [verbatim] :

> "Why don't you put us both out of our misery by returning my money without the necessity of the additional cards?  Why are they so important to you?  What effect could they possibly have on anything?  The sooner you return my money the sooner you will get yours back.  I am not going to buy any more cards ever again.  I am through with all of that, it's a thing of the past.  I don't know why you don't yet understand that.  Stop asking me to get more cards because it is never going to happen.  Return my money and put an end to all of this nonsense."

89.     On November 15, 2018, at approximately 12:30 p.m. [time zone not noted], THOMAS responded to this message via THE SUBJECT EMAIL ACCOUNT.  Thomas wrote [verbatim]:

> "We will be more than happy to return your money only if you get the cards without them the money could not be released to your account therefore you need to get the cards in order to get your money back and that's period."

90.     I submit Thomas informed D.O. that Thomas will only return the funds D.O. provided to Thomas under fraudulent pretenses if D.O. purchases and provides additional gift cards to Thomas.

91.     On January 9, 2019, I received another forwarded email message from D.O., who received the message from the SUBJECT EMAIL ACCOUNT the same day, at 4:13 p.m. [time zone not noted].  The email has the subject line "Attention [D.O.]."  The email states [verbatim]:

> "You will be glad to know we have discovered a way through which you can have your money back without getting the cards.  Therefore we kindly request you call us as soon as possible so that we can settle this issue once and forever."

92.     I submit the email is an attempt to obtain additional gift cards from D.O. under the fraudulent pretense that doing so will result in the return of the funds D.O. has already surrendered in the scheme.

### F.     IQBAL's Involvement in a Similar Scheme Before Coming to the United States.

93.     On December 4, 2018 I received a copy of police report from the Breckenridge (Colorado) Police Department, number 2015-00004050, concerning their investigation of Aaakash Gupta.  According to those reports, on April 8, 2015, Gupta attempted to cash a check for $3,600 from victim T.S., who resided in Colorado but was turned away because the bank believed it was fraudulent.

94.     When Breckenridge Sergeant Lyn Herford called T.S., T.S. reported that T.S. in January 2014 a man called offering to update the software on T.S.'s computer for $400.  T.S. paid for the service.  In approximately April 2015 T.S. received a call from a person identifying himself as Aakash Gupta.  Gupta said Gupta wanted to refund the money T.S. had spent on services and needed access to T.S.'s account.  T.S. then observed on T.S.'s computer that T.S. was refunded $4,000 instead of $400.  Gupta told T.S. it was a mistake and that T.S. should mail Gupta a check for the $3,600.

95.     Sergeant Herford and Breckenridge Detective Alex Blank interviewed Gupta on April 8, 2015.  Initially, Gupta told Detective Blank that the $3,600 check had been sent to Gupta by a friend.  Furthermore, the investigators found no information on Gupta's phone [provided to them voluntarily] linking Gupta with victim T.S.  However, Detective Blank reported that Gupta's statement about the check was not accurate and the details Gupta described about it changed during Gupta's discussion with the investigators.

96.     The Breckenridge investigators asked Gupta about engaging in similar transactions and whether Gupta knew about a computer scam.  Gupta denied any knowledge, but eventually admitted that Gupta had attempted similar transactions at other banks.  Gupta said did so because Gupta was threatened by a "man on the phone" threatening him.  Gupta initially said Gupta did not think Gupta had done anything wrong, but then admitted to "falling for it," referencing depositing checks that were probably not legitimate.  Gupta eventually provided information about depositing several checks at several banks in the area.

97.     Included with Breckenridge Police Department's reports of their investigation into Gupta was a copy of an Indian Passport in the name of Aakash Gupta.  The passport has number L8038474.

98.     On December 4, 2018 I received records from Western Union.  Those records show that on January 26, 2015, a person named Aakash Gupta, providing an address in Breckenridge, Colorado and presenting an Indian passport with number L8038474, used Western Union to send approximately  $1,000 to a person named SAFDER IQBAL in Kolkata India.  The Western Union records reveal that Gupta, without an identification number, also sent the following amounts on the dates identified to a person name SAFDER IQBAL in 2015:  February 7, $800; February 24, $250; March 14, $400; March 27, $920.   For each of the five transactions occurring between January 26, 2015 and March 27, 2015, Western Union records identify telephone number 08100379785 as the telephone number used by the recipient of the money.  That is the same number IQBAL reported as IQBAL's primary telephone number in paperwork IQBAL submitted to the United States as part of IQBAL's application to come to the United States in 2018.  Based on this information, I submit there is probable cause to believe that Safer IQBAL has been involved in criminal activity since at least 2015.

## VI.     Identification of RAJESH SINGH BAGHEL as a Scheme Associate and his use of the BAGHEL FACEBOOK ACCOUNT.

99.     I interviewed SAFDER IQBAL on November 15, 2018 pursuant to a proffer agreement.  During that interview, I showed IQBAL a photograph of an individual known to me as RAJESH SINGH BAGHEL.  IQBAL positively identified the photograph.  During a later interview pursuant to that same proffer agreement, on November 27, 2018, IQBAL voluntarily showed me Facebook messages sent between the IQBAL FACEBOOK ACCOUNT and the BAGHEL FACEBOOK ACCOUNT.  I took photographs of those messages and tasked a Hindi translator for a preliminary translation of the non-English text.  Below are some of those photographs and the corresponding, preliminary translation from an exchange that took place on or about May 25, 2018 in which the two, referenced elements common to the scheme described above, including: the use of gift cards; the use of China to "get it done" in reference to those gift cards; and popular gift card retailers such as Apple, Best Buy, Walmart and Target.  Messages from BAGHEL are in grey; messages from IQBAL are in blue:



RB: It is okay.

SI: *After one month, I will give your name for Canada.*

*RB: OK*

SI: And do you also take *gift card*

RB: Yes.

*All gc [gift cards]*
*Get it done through China.*
*Have a runner for that in USA.*

SI: Oh.
How much do you get for 100
USD in INR[Indian Rupees].

RB: *Maximum is for Apple.*

SI: *100 USD* in *INR*

RB: Maximum is for Apple;
85%
*Minimum is for Best Buy; 68*
*70+ Walmart*
70 Michael Kors
*Target 70*

SI: What is the *minimum gift* that you get.

RB: 500.
*Daily volume is approximately 50K.*

SI: Okay, I will let you know about the gift card also.
By tomorrow morning.

**THERE IS PROBABLE CAUSE TO BELIEVE THAT EVIDENCE RELATING TO THE SUBJECT CRIMES WILL BE FOUND INSIDE THE SUBJECT FACEBOOK ACCOUNTS AND THE SUBJECT EMAIL ACCOUNT**

## VII.   Background:  The Internet and Email

100.    The following definition applies to this Affidavit and Attachment D to this Affidavit.

101.    In this affidavit, the terms "computers" or "digital storage media" or "digital storage devices" may be used interchangeably, and are intended to include any physical object upon which computer data can be recorded as well as all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices capable of performing logical, arithmetic, or storage functions, including desktop and laptop computers, mobile phones, tablets, server computers, game consoles, network hardware, hard disk drives, RAM, floppy disks, flash memory, CDs, DVDs, and other magnetic or optical storage media.

102.    I am familiar with the Internet (also commonly known as the World Wide Web), which is a global network of computers and other electronic devices that communicate with each other using various means, including standard telephone lines, high-speed telecommunications links (e.g., copper and fiber optic cable), and wireless transmissions, including satellite.  Due to the structure of the Internet, connections between computers on the Internet routinely cross state and international borders, even when the computers communicating with each other are in the same state.  Individuals and entities use the Internet to gain access to a wide variety of information; to send information to, and receive information from, other individuals; to conduct commercial transactions; and to communicate via electronic mail ("e-mail").  An individual who wants to use Internet e-mail must first obtain an account with a computer that is linked to the Internet – for example, through a university, an employer, or a commercial service – which is called an "Internet Service Provider" or "ISP" (see definition of "Internet Service Provider" below).  Once the individual has accessed the Internet, that individual can use an e-mail account provided by their ISP or they can use the Internet to connect to public web-based e-mail services to send and receive e-mail.  Web-based e-mail services provide e-mail accounts that may be accessed from any computer that has access to the Internet.  In addition, the individual can access websites using web browsers to view or download content, or make purchases.   The Internet may also be used to access online groups such as chat rooms, websites, social media, newsgroups and video conferencing.

103.    **E-mail Provider**:

a.      In my experience, I have learned that Microsoft Corporation (hereinafter "Provider") provides a variety of on-line services, including electronic mail ("e-mail") access, to the general public.  Subscribers obtain an account by registering with Provider.  During the registration process, Provider asks subscribers to provide basic personal information.  Most public providers do not validate the information provided, however.  Nevertheless, the computers of Provider are likely to contain stored electronic communications (including retrieved and un-

retrieved e-mail for Provider subscribers) and information concerning subscribers and their use of Provider services, such as account access information, e-mail transaction information, and account application information.

b.      In general, an e-mail that is sent to a Provider subscriber is stored in the subscriber's "mail box" on Provider servers until the subscriber deletes the e-mail, or until a preservation letter is sent to the e-mail provider.  If the subscriber does not delete the message, or if the e-mail provider preserves the content of the account pursuant to a preservation letter, the message can remain on Provider servers as long as the account remains active.  Users of Microsoft's servers can elect to download all emails off of Microsoft services onto their own computer.  In that case, Microsoft will not have available any content.

c.      When the subscriber sends an e-mail, it is initiated at the user's computer, transferred via the Internet to Provider servers, and then transmitted to its end destination. Provider often saves a copy of the e-mail sent.  Unless the sender of the e-mail specifically deletes the e-mail, downloads it off of Microsoft servers, or if the e-mail provider preserves the content of the account pursuant to a preservation letter, the e-mail can remain on the system indefinitely.

d.      Provider subscribers can also store files, including e-mails, address books, contact or buddy lists, pictures, and other files, on servers maintained and/or owned by Provider.

104.   **Internet Service Providers ("ISPs"):**

a.      ISPs are commercial organizations that are in business to provide individuals and businesses access to the Internet.  ISPs provide a range of functions for their customers including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.  ISPs can offer a range of options in providing access to the Internet including broadband based access via digital subscriber line (DSL) or cable television, dedicated circuits, or satellite based subscription.  ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, that the connection supports.  Many ISPs assign each subscriber an account name – a user name or screen name, an "e-mail address," an e-mail mailbox, and a personal password selected by the subscriber.  By using a computer equipped with a modem, the subscriber can establish communication with an ISP over a telephone line or through a cable system, and can access the Internet by using his or her account name and personal password.

b.      ISPs maintain records ("ISP records") pertaining to their subscribers (regardless of whether those subscribers are individuals or entities).  These records may include account application information, subscriber and billing information, account access information (often times in the form of log files), e-mail communications, information concerning content uploaded and/or stored on or via the ISP's servers, and other information, which may be stored both in computer data format and in written or printed record format.  ISPs reserve and/or maintain computer disk storage space on their computer system for their subscribers' use.  This service by ISPs allows for both temporary and long-term storage of electronic communications and many other types of electronic data and files.  Typically, e-mail that has not been opened by an ISP customer is stored temporarily by an ISP incident to the transmission of that e-mail to the

intended recipient, usually within an area known as the home directory. Such temporary, incidental storage is defined by statute as "electronic storage," [18 U.S.C. § 2510(17)] and the provider of such a service is an "electronic communications service." An "electronic communications service," as defined by statute, is "any service which provides to users thereof the ability to send or receive wire or electronic communications [18 U.S.C. § 2510(15)]. A service provider that is available to the public and provides storage facilities after an electronic communication has been transmitted and opened by the recipient, or provides other long term storage services to the public for electronic data and files, is defined by statute as providing a "remote computing service" [18 U.S.C. § 2711(2)].

105.    **Internet Protocol Address ("IP Address")**: Every computer or device on the Internet is referenced by a unique Internet Protocol address the same way every telephone has a unique telephone number. An IP address is a series of numbers separated by periods; an example of an IP address is 192.168.10.102. Each time an individual accesses the Internet, the computer from which that individual initiates access is assigned an IP address. A central authority provides each ISP a limited block of IP addresses for use by that ISP's customers or subscribers. Most ISPs employ dynamic IP addressing, that is they allocate any unused IP address at the time of initiation of an Internet session each time a customer or subscriber accesses the Internet. A dynamic IP address is reserved by an ISP to be shared among a group of computers over a period of time. The ISP logs the date, time and duration of the Internet session for each IP address and can identify the user of that IP address for such a session from these records. Typically, users who sporadically access the Internet via a dial-up modem will be assigned an IP address from a pool of IP addresses for the duration of each dial-up session. Once the session ends, the IP address is available for the next dial-up customer. On the other hand, some ISPs, including most cable providers, employ static IP addressing, that is a customer or subscriber's computer is assigned one IP address that is used to identify each and every Internet session initiated through that computer. In other words, a static IP address is an IP address that does not change over a period of time and is typically assigned to a specific computer. A modem is an electronic device that allows one computer to communicate with another.

106.    A host computer is one that is attached to a dedicated network and serves many users. These host computers are sometimes commercial online services, which allow subscribers to connect to a network, which is in turn connected to their host systems. These service providers allow electronic mail service between their own subscribers, and those of other networks or individuals on the Internet.

107.    Contact with others online can be either open and anonymous, or private and personal in the form of person-to-person instant messages.

108.    Further, the online services allow a user to set up an account with a remote computing service that provides e-mail services as well as electronic storage of computer files in any variety of formats. A user can set up an online storage account from any computer with access to the Internet. These online storage accounts are often free but can involve a charge. A subscriber assigned a free online storage account frequently can set up such accounts by providing limited identifying information. Any information provided is frequently fictitious in an attempt to preserve the anonymity of the user. Consequently, even if it is known that a particular user is a subscriber of a free online storage service, the service provider frequently will

have no records in that subscriber's name.  Instead, the online service will only be able to identify files, that are associated with a "login," or unique, user-created identity the subscriber uses to "log on" to the online service.  Such an online storage account is particularly useful to those communicating with coconspirators in other countries and time zones.  Such a subscriber can collect, store, view and distribute electronic files directly from the online service.  Consequently, files that may be evidence of a crime may also have minimal contact with the subscriber's home computer.  The subscriber can also manipulate the files on an online storage service from any computer connected to the Internet.  Nonetheless, evidence of an online storage account is often found on a home computer of a user subscribing to such a service.  Evidence of an online storage account may take the form of passwords located in encrypted, archived[1], or other files on the user's home computer.  Other evidence can also be found through unique software that may exist on a user's home computer that has been developed by the online storage service.  This unique software will frequently contain evidence not only of the existence of such accounts, but the login and password.

## I.  **Background:  Facebook**

109.   Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.  Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

110.   Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Facebook also assigns a user identification number to each account.

111.   Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

112.   Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A

---

1 Archive files are files which generally contain other files in a compressed format.  Thus, Archive files may be thought of as containers containing other files.  Archive files are commonly referred to as "zip" or "zipped" files.

Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings.  Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

113.     Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.  Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.  In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times.  A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.  Depending on the user's privacy settings, Facebook may also obtain and store the physical location of the user's device(s) as they interact with the Facebook service on those device(s)

114.     Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video.  It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video.  When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video.  For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

115.     Facebook users can exchange private messages on Facebook with other users.  These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information.  Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.  In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook.  These chat communications are stored in the chat history for the account.  Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

116.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

117.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (i.e., non-Facebook) websites.  Facebook users can also become "fans" of particular Facebook pages.

118.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

119.     Each Facebook account has an activity log, which is a list of the user's posts and

other Facebook activities from the inception of the account to the present.  The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend.  The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

120.   Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

121.   The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page.  Gifts cost money to purchase, and a personalized message can be attached to each gift.  Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

122.   Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

123.   In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform.  When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

124.   Facebook uses the term "Neoprint" to describe an expanded view of a given user profile.  The "Neoprint" for a given user can include the following information from the user's profile:  profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

125.   Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address.  These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action.  For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

126.   Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).  In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by

the provider or user as a result of the communications.

127.    Facebook allows users to "deactivate" their accounts, which means that no one else can see the profile.  However, messages sent to friends may still be visible and friends are still able to see the name of the deactivated account in their friends list.  Additionally, the administrators of groups may still be able to see the deactivated account's posts and comments. Deactivated accounts can still use Facebook messenger to send messages to others.

128.    As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  It is my understanding that a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation.  Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation.  Additionally, Facebook builds geo-location into some of its services.  Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other.  This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation.  For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

129.    Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## II.    Retention of Information in the SUBJECT FACEBOOK ACCOUNTS and the SUBJECT EMAIL ACCOUNT

130.    I requested the preservation of the SUBJECT FACEBOOK ACCOUNTS via Facebook's online law enforcement portal on the following dates: the IQBAL FACEBOOK ACCOUNT on November 29, 2018; the RASHID FACEBOOK ACCOUNT, on January 8, 2019; the NAWEED FACEBOOK ACCOUNT on October 25, 2018; the THOMAS FACEBOOK ACCOUNT on October 24, 2018; the BAGHEL FACEBOOK ACCOUNT on

April 27, 2018; the ALAM FACEBOOK ACCOUNT on January 8, 2019; the HOLMQUIST ACCOUNT on August 22, 2018.

131.    On October 1, 2018, pursuant to a federal court order, I received records from Facebook concerning the ALAM FACEBOOK ACCOUNT.  Among other information, the records stated that the account had been deactivated on March 3, 2018.  However, Facebook's response to that order included non-content information about the account for records before that time and, based on the information about deactivated accounts set forth above, I believe that Facebook may retain the content of that account.

132.    As set forth above, there is probable cause to believe that the SUBJECT FACEBOOK ACCOUNTS are being used by ZEESHAN ALAM, SAFDER IQBAL, DANISH RASHID, MOHAMMED NAWEED, and RAJESH SINGH BAGHEL to gather and disseminate information about schemes to defraud elderly victims, to communicate with others about their efforts to execute those frauds, and to communicate with fraud victims.  Based on my requests to Facebook to retain the content of those accounts, as well as the information set forth above about the information Facebook maintains about its users, I submit there is probable cause to believe that the SUBJECT FACEBOOK ACCOUNTS will contain evidence, fruits, and instrumentalities of the SUBJECT CRIMES.

133.    On October 16, 2018, I requested Microsoft preserve the SUBJECT EMAIL ACCOUNT. I requested again on January 14, 2019 that Microsoft preserve the SUBJECT EMAILA CCOUNT.  On November 15, 2018, pursuant to a federal court order, I received records from Microsoft concerning the SUBJECT EMAIL ACCOUNT.  Among other things, the records show Microsoft has records of the SUBJECT EMAIL ACCOUNT using the "outlook.com" [Microsoft] domain.

134.    As set forth above, there is probable cause to believe that MOHAMMED NAWEED, using the name "Mark Thomas," is using the SUBJECT EMAIL ACCOUNT to advance a scheme to defraud victim D.O. of money and things of value through the use of false and fraudulent pretenses, promises and representations.  Because I have preserved the account, I respectfully submit that there is probable cause to believe that the SUBJECT EMAIL ACCOUNT will contain evidence of the SUBJECT CRIMES.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

135.    I anticipate executing these warrants under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook and Microsoft to disclose to the government copies of the records and other information (including the content of communications) particularly respectively described in Section I of Attachments B & D.  Upon receipt of the information described in Section I of Attachments B & D, government-authorized persons will review that information to locate the items described in Section II of Attachments B & D.

136.    This application seeks warrants to search all responsive records and information under the control of Facebook and Microsoft, a provider subject to the jurisdiction of this court, regardless of where Facebook or Microsoft has chosen to store such information. The

government intends to require the disclosure pursuant to the requested warrant of the contents of wire or electronic communications and any records or other information pertaining to the customers or subscribers if such communication, record, or other information is within Facebook's possession, custody, or control, regardless of whether such communication, record, or other information is stored, held, or maintained outside the United States. [2]

## REQUEST FOR NON-DISCLOSURE AND [TO KEEP ACCOUNT ACTIVE

137.    Pursuant to 18 U.S.C. §§ 2703(b)(1)(A) and 2705(b), your Affiant requests the Court order Provider not to notify any other person of the existence of this warrant for the period of one year.  This request is made because notification of the existence of the warrant could result in subjects' flight from prosecution as well as the destruction of or tampering with evidence.

138.    Because the investigation is ongoing, I would further request the Court to order Provider to continue to maintain the SUBEJCT FACEBOOK ACCOUNTS further detailed in Attachment A, and the SUBJECT EMAIL ACCOUNT in Attachment C in an open and active status.  The United States further requests that the Order require  not to notify any person, including the subscribers or customers of the account listed in Part I of Attachments A and B, of the existence of the Order for a period of one year from the date of the Order. See 18 U.S.C. § 2705(b). This Court has authority under 18 U.S.C. § 2705(b) to issue "an order commanding a provider of electronic communications service or remote computing service to whom a warrant, subpoena, or court order is directed, for such period as the court deems appropriate, not to notify any other person of the existence of the warrant, subpoena, or court order." Id. In this case, such an order would be appropriate because the requested Order relates to an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation, and its disclosure may alert the targets to the ongoing investigation. Accordingly, there is reason to believe that notification of the existence of the requested Order will seriously jeopardize the investigation, including by giving targets an opportunity to flee or continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, and intimidate potential witnesses. See 18 U.S.C. § 2705(b).  These risks are especially apparent here, where the FBI has uncovered evidence that the subjects participating in the fraud do so from oversees or from areas outside the jurisdiction of the United States, but may visit the United States on occasion.  Under these circumstances, alerting the subjects to the investigation may prevent them from voluntarily submitting to United States jurisdiction.  It is highly likely that some of the evidence in this investigation is stored electronically on the telephones and computers of individuals participating and aiding and abetting in the fraud and money laundering.  If alerted to

---

[2] It is possible that Facebook or Microsoft stores some portion of the information sought outside of the United States.  In Microsoft Corp. v. United States, 2016 WL 3770056 (2nd Cir. 2016), the Second Circuit held that the government cannot enforce a warrant under the Stored Communications Act to require a provider to disclose records in its custody and control that are stored outside the United States. As the Second Circuit decision is not binding on this court, I respectfully request that this warrant apply to all responsive information— including data stored outside the United States—pertaining to the identified account that is in the possession, custody, or control of Facebook. The government also seeks the disclosure of the physical location or locations where the information is stored.

the investigation, the subjects under investigation could destroy that evidence, including information saved to their personal computers.

## CONCLUSION

139.     This Court has jurisdiction to issue the requested warrants because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

140.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of these warrants.

141.     Based on the aforementioned factual information, I respectfully submit that there is probable cause to believe that evidence, fruits, and instrumentalities The SUBJECT CRIMES may be located within the SUBJECT FACEBOOK ACCOUNTS described in Attachment A and the SUBJECT EMAIL ACCOUNT described in Attachment C..

142.     I, therefore, respectfully request that the attached warrant be issued authorizing the search and seizure of the items listed in Attachments B and D.

_/s Justin Stern_____
Justin Stern, Special Agent
FBI

SUBSCRIBED and SWORN before me this 15 th day of January,  2019.

HON. KRISTEN L. MIX
UNITED STATES MAGISTRATE JUDGE

Application for search warrant was reviewed and is submitted by Bryan David Fields Assistant United States Attorney.

# ATTACHMENT A

## DESCRIPTION OF LOCATION TO BE SEARCHED

This warrant applies to information associated with

1. Facebook account number 100026184494480 associated with user "Sheldon.Holmquist.7 having a subscriber in the name of Sheldon Holmquist" (the "HOLMQUIST FACEBOOK ACCOUNT");

2. Facebook account identification 610723829, having a subscriber in the name of ZEESHAN ALAM (the "ALAM FACEBOOK ACCOUNT");

3. Facebook account number 100001474806547 associated with user "Safder.Iqbal3" (the "IQBAL FACEBOOK ACCOUNT";

4. Facebook account number 100001004915579 associated with user "Danish.Rashid.315 (the "RASHID FACEBOOK ACCOUNT");"

5. Facebook account number 100001381703228 associated with user "shelton.valentine," having a subscriber in the name of Naweed Shelton Valentine (the "NAWEED FACEBOOK ACCOUNT");

6. Facebook account number 100029368398250, having a subscriber in the name of "Mark Thomas" (the "THOMAS FACEBOOK ACCOUNT").

7. Facebook account number 1451624837 associated with user "rajesh.s.baghel (the "BAGHEL FACEBOOK ACCOUNT")

that are stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company headquartered in Menlo Park, California.

**ATTACHMENT B**

**DESCRIPTION OF ITEMS TO BE SEIZED AND SEARCHED**

Pursuant to 18 U.S.C. § 2703, PROVIDER as described in Attachment A is hereby ordered as follows:

**I.    Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A (the "SUBJECT ACCOUNTS"), regardless of whether such information is stored, held or maintained inside or outside of the United States:

(a)    All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, multi-factor authentication information and other personal identifiers.

(b)    All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

(c)    All original photos and videos uploaded by that user ID and all original photos and videos uploaded by any user that have that user tagged in them; The aforementioned photos and videos should contain the original EXIF data.

(d)    All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)    All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

(f)    All "check ins" and other location information;

(g)    All IP logs, including all records of the IP addresses that logged into the account;

(h)    All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(i)     All information about the Facebook pages that the account is or was a "fan" of;

(j)     All past and present lists of friends created by the account;

(k)     All records of Facebook searches performed by the account;

(l)     All information about the user's access and use of Facebook Marketplace;

(m)     The types of service utilized by the user;

(n)     The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(o)     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(p)     All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

(q)     All physical location data collected by Facebook for the user of the account, including any data collected by Facebook's location services via the user's mobile phone or other device, on a real-time or near-real time basis. Facebook is required to provide any such data they collect, regardless of the time of day.

## II.     Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of federal crimes relating to fraud, money laundering and conspiracy, including access device fraud (18 U.S.C. § 1029), computer fraud (18 U.S.C. § 1030), mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), interstate transportation of stolen goods (18 U.S.C. § 2314), interstate travel in or transportation in aid of a racketeering enterprise (18 U.S.C. § 1952), money laundering (18 U.S.C. § 1956(a)), conspiracy to commit these crimes (18 U.S.C. §§ 371, 1030(b), 1349, 1956(h)), and aiding and abetting these crimes (18 U.S.C. § 2) (the "SUBJECT CRIMES") involving ZEESHAN ALAM, DANISH RASHID, SAFDER IQBAL, MOHAMMED NAWEED and RAJESH SINGH BAGHEL since January 1, 2015, including, for each of the SUBJECT ACCOUNTS on Attachment A, information pertaining to the following matters:

(a)     Information relating to (1) efforts by ALAM, RASHID, IQBAL, NAWEED, BAGHEL or others aiding and abetting their efforts to execute a SUBJECT CRIME, (2) the receipt, transportation, transmission, transfer, and sale of money, gift, cards, or other things of value representing the proceeds of a SUBJECT CRIME by ALAM, RASHID, IQBAL, NAWEED, BAGHEL or others aiding and abetting them, (3) efforts to conceal and obscure

financial transactions relating to a SUBJECT CRIME by ALAM, RASHID, IQBAL, NAWEED or BAGHEL or others aiding and abetting them, (4) the means and methods used by ALAM, RASHID, IQBAL, NAWEED or BAGHEL or others aiding and abetting them to defraud victims and execute a SUBJECT CRIME, including computer intrusion techniques, scripts of encounters with victims, and financial transactions facilitating a SUBJECT CRIME;

(b)      Information indicating the state of mind of any user of the SUBJECT ACCOUNTS as it relates to the SUBJECT CRIMES;

(c)      Communications between and among the SUBJECT ACCOUNTS and others related to the SUBJECT CRIMES;

(d)      Records and information relating to efforts to recruit others to commit the SUBJECT CRIMES;

(e)      Records and information describing or relating to financial transactions involving the proceeds of the SUBJECT CRIMES;

(f)      Records and information relating to the scheme to defraud victim D.O;

(g)      Records and information relating to the scheme to defraud victim P.D.;

(h)      Records and information relating to the SUBJECT CRIMES for victims other than D.O. and P.D.;

(i)      Records and information indicating how, when, and where the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the SUBJECT CRIMES and to the Facebook account owner;

(j)      Location information relevant to the SUBJECT CRIMES and that helps identify the user of the account or events relating to the crime to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner and the owner's contacts;

(k)      The identity of the person(s) who created or used the SUBJECT ACCOUNTS, including records that help reveal the whereabouts of such person(s);

(l)      The identity of the person(s) who communicated with the SUBJECT ACCOUNTS described in Attachment A about the SUBJECT CRIMES, including records that help reveal their whereabouts.

### III.  ORDER OF NON-DISCLOSURE AND ORDER NOT TO TAKE ADVERSE ACTION AGAINST THE ACCOUNT

3

(a)  Pursuant to 18 U.S.C. §§ 2703(b)(1)(A) and 2705(b), the Court orders Facebook not to disclose the existence of this search warrant to any person for the period of one year, including the subscriber, other than its personnel essential for compliance with the execution of this warrant.

(b)  So as not to disrupt this ongoing investigation, the Court further orders Facebook that it is not to take adverse action against the SUBJECT ACCOUNTS, such as shutting them down, because of this Warrant.

## IV.  PROVIDER PROCEDURES

a.  The PROVIDER shall deliver the information set forth above within **14 days** of the service of this warrant and the PROVIDER shall send the information to:

> Special Agent **Justin Stern**
> **Federal Bureau of Investigation**
> **jdstern@fbi.gov**

a.  Pursuant to 2703(g), the presence of an agent is not required for service or execution of this warrant.

## V.  DEFINITIONS

a.  As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored.

**ATTACHMENT C**

**<u>DESCRIPTION OF LOCATION TO BE SEARCHED</u>**

Information associated with the e-mail account known as "winsurf.technology@outlook.com" (hereinafter and in Attachment D "SUBJECT EMAIL ACCOUNT") which is in the possession of or under the control of the E-mail and Internet Service Provider Microsoft Corporation whose office is located at One Microsoft Way, Redmond, WA 98052-6399 (hereinafter and in Attachment D "PROVIDER.")

## ATTACHMENT D

### DESCRIPTION OF ITEMS TO BE SEIZED AND SEARCHED

Pursuant to 18 U.S.C. § 2703, PROVIDER as described in Attachment C is hereby ordered as follows:

## I.      SEARCH PROCEDURE

a.  The search warrant will be presented to personnel of the PROVIDER, who will be directed to isolate those accounts and files described in Section II below regardless of whether such information is stored, held or maintained inside or outside of the United States;

b.  In order to minimize any disruption of computer service to innocent third parties, the PROVIDER'S employees and/or law enforcement personnel trained in the operation of computers will create an exact duplicate of the computer accounts and files described in Section II below, including an exact duplicate of all information stored in the computer accounts and files described therein;

c.  The PROVIDER'S employees will provide the exact duplicate in electronic form of the accounts and files described in Section II below and all information stored in those accounts and files to the agent who serves the search warrant; and

d.  Law enforcement personnel will thereafter review all information and records received from the PROVIDER'S employees to determine the information to be seized by law enforcement personnel specified in Section III.

## II.      FILES AND ACCOUNTS TO BE DISCLOSED BY
## THE PROVIDER'S EMPLOYEES

a.  For the SUBJECT EMAIL ACCOUNT listed in Attachment A for the time period from the date the SUBJECT EMAIL ACCOUNT was created, to the date the PROVIDER collects the data in response to this order the PROVIDER shall disclose the following information regardless of whether it is held inside or outside the United States, and the disclosure shall include all information even if deleted yet still available to the PROVIDER, and all information preserved pursuant to a request under 18 U.S.C. § 2703(f):

1.  The contents of all e-mails and attachments associated with the SUBJECT EMAIL ACCOUNT, including deleted, stored, or preserved (pursuant to 18 U.S.C. § 2703(f) or otherwise) e-mails sent to and from the account, draft e-mails, existing printouts of any such e-mails, the source and destination addresses associated with each e-mail, the date and time at which each e-mail was sent, and the size and length of each e-mail, and the true and accurate header information

1

including the actual IP addresses of the sender and the recipient of the emails, and all attachments;

2.  All records and information regarding locations where the account was accessed or used, including all data stored in connection with Location Services;

3.  All records pertaining to communications between the PROVIDER and any person regarding the account, including contacts with support services and records of actions taken; and

4.  All files, keys, or other information necessary to decrypt any data produced in an encrypted form, when available to the provider (including, but not limited to, the keybag.txt and fileinfolist.txt files).

5.  All records or other information regarding the identification of the SUBJECT ACCOUNT, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses, phone numbers, or other identifying information provided during registration, other associated e-mail and other online accounts, all screen names associated with the subscribers and/or accounts, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

6.  The services the SUBJECT ACCOUNT utilized and all records generated by those services;

7.  All records or other information stored at any time by an individual using the SUBJECT ACCOUNT, including address books, contact and buddy lists, calendar data, pictures, and files;

8.  All records pertaining to communications between the PROVIDER and any person regarding the SUBJECT ACCOUNT, including contacts with support services and records of actions taken.

9.  For all information responsive to this warrant, regardless of whether such information is stored, held or maintained inside or outside of the United States, the physical location or locations where the information is stored.

     b.  The Provider is hereby ordered to disclose the above information to the government within 14 of the issuance of this warrant.

## III.    INFORMATION TO BE SEIZED BY LAW ENFORCEMENT PERSONNEL

b.  All information described above in Section II that constitutes fruits, evidence and instrumentalities of violations of fraud, money laundering and conspiracy, including access device fraud (18 U.S.C. § 1029), computer fraud (18 U.S.C. §  1030), mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), interstate transportation of stolen goods (18 U.S.C. § 2314), interstate travel in or transportation in aid of a racketeering enterprise (18 U.S.C. § 1952), money laundering (18 U.S.C. § 1956(a)), conspiracy to commit these crimes (18 U.S.C. §§ 371, 1030(b), 1349, 1956(h)), and aiding and abetting these crimes (18 U.S.C. § 2) (the "SUBJECT CRIMES") involving MOHAMMED NAWEED.

1.  All electronic mail, attachments, and related computer files that identify the account user, individuals, or correspondents engaged in the SUBEJCT CRIMES;

2.  Information relating to (1) by NAWEED to execute a SUBJECT CRIME, (2) the receipt, transportation, transmission, transfer, and sale of money, gift, cards, or other things of value representing the proceeds of a SUBJECT CRIME by NAWEED or others aiding and abetting him, (3) efforts to conceal and obscure financial transactions relating to a SUBJECT CRIME by NAWEED or others aiding and abetting him, (4) the means and methods used by NAWEED or others aiding and abetting him to defraud victims and execute a SUBJECT CRIME, including computer intrusion techniques, scripts of encounters with victims, and financial transactions facilitating a SUBJECT CRIME;

3.  Information indicating the state of mind of any user of the SUBJECT EMAIL ACCOUNT as it relates to the SUBJECT CRIMES;

4.  Communications between and among the SUBJECT EMAIL ACCOUNT and others related to the SUBJECT CRIMES;

5.  Records and communications relating to efforts to recruit others to commit the SUBJECT CRIMES;

6.  Records and communications describing or relating to financial transactions involving the proceeds of the SUBJECT CRIMES;

7.  Records and information relating to the scheme to defraud victim D.O;

Records and information relating to the SUBJECT CRIMES for victims other than D.O.;

8.  Records and information relating to who created, used, or communicated with the SUBJECT ACCOUNT or identifier, including records about their identities and whereabouts.

### IV.  ORDER OF NON-DISCLOSURE AND TO KEEP ACCOUNT ACTIVE

a. Pursuant to 18 U.S.C. §§ 2703(b)(1)(A) and 2705(b), the Court orders PROVIDER not to disclose the existence of this search warrant to any person for a period of one year, including the subscriber, other than its personnel essential for compliance with the execution of this warrant.

b. The Court further orders PROVIDER to continue to maintain the SUBJECT EMAIL ACCOUNT in an open and active status so as not to disrupt this ongoing investigation.

## V.    PROVIDER PROCEDURES

b. The PROVIDER shall deliver the information set forth above within **14 days** of the service of this warrant and the PROVIDER shall send the information to:

> Special Agent **Justin Stern**
> **Federal Bureau of Investigation**
> **jdstern@fbi.gov**

a. Pursuant to 2703(g), the presence of an agent is not required for service or execution of this warrant.

## VI.    DEFINITIONS

b. As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored.